# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

DEBRA L. REEVES,            )
                                   )
                                   )
                 Plaintiff,         )
                                   )
v.                                )       No.  04-CV-791-SAJ
                                   )
JO ANNE B. BARNHART,        )
Commissioner of Social Security     )
Administration,               )
                                   )
                Defendant.     )

### OPINION AND ORDER[1/]

Pursuant to 42 U.S.C. § 405(g), Plaintiff appeals the decision of the Commissioner denying Social Security benefits.[2/]  Plaintiff asserts that the Commissioner erred because

---

[1/]   This Order is entered in accordance with 28 U.S.C. § 636(c) and pursuant to the parties' Consent to Proceed Before United States Magistrate Judge.

[2/]   Administrative Law Judge Richard J. Kallsnick (hereafter "ALJ") concluded that Plaintiff was not disabled by decision dated July 19, 1994.  [R. at 190 - 201].  Following an appeal to the Appeals Council, the case was remanded to the ALJ.  [R. at 214].

     ALJ Kallsnick again determined that Plaintiff was not disabled by decision dated August 17, 1995.  [R. at 12 - 24].  Plaintiff appealed the decision by the ALJ to the Appeals Council.  The Appeals Council declined Plaintiff's request for review on December 19, 1996.  [R. at 5].  Plaintiff appealed to the District Court, and the action was remanded for further proceedings by the Commissioner by decision dated May 15, 1998.  [R. at 285].  The action was remanded by the Appeals Council, based on the District Court decision, on June 6, 1998.  [R. at 283-84].  (The District Court concluded that Plaintiff's treating physicians indicated that Plaintiff had some restrictions from the use of her neck or upper extremities.  The ALJ noted that Plaintiff did not complain to other physicians about arm pain, but the Court concluded the ALJ's discussion was insufficient to determine whether or not the ALJ considered the treating physician's opinions that Plaintiff had some limitations due to her neck and upper extremities.  The action was remanded to permit the ALJ to evaluate Plaintiff's claimed limitations of her neck and arm.)  [R. at 296].

     After an additional hearing before the ALJ, ALJ James D. Jordan issued an unfavorable decision, finding that Plaintiff was not disabled, on February 10, 1999.  [R. at 269].  Plaintiff's appeal to the Appeals Council was declined on February 17, 1999.  [R. at 266].  Plaintiff appealed to the District Court.  By agreement of the parties, the action was remanded by the District Court, for the second time, on June 12, 2001.  [R. at 397-98].

     After another hearing before the ALJ, ALJ James D. Jordan issued an unfavorable decision on December 9, 2002.  [R. at 395I-395W].  On May 2, 2000, Plaintiff's appeal to Appeals Council was denied.  [R. at 260-61].

(1) the ALJ failed to properly evaluate the opinions of Plaintiff's treating physicians, (2) the ALJ failed to perform a proper Step Two and Step Three analysis; (3) the ALJ failed to properly consider Plaintiff's credibility, and (4) the ALJ failed to perform a proper Step Four and Step Five analysis.   For the reasons discussed below, the Court **reverses and remands** the Commissioner's decision for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL HISTORY

Plaintiff has had four hearing before the ALJ, and been denied benefits at each hearing.  The Appeals Council remanded Plaintiff's case for additional consideration by the ALJ.  In addition, Plaintiff has appealed the decisions by the ALJ to the District Court on three separate occasions.   On Plaintiff's first appeal, her decision was reversed for additional consideration of restrictions related to Plaintiff's neck or upper arm movement. On Plaintiff's second appeal, the parties agreed to a remand, and Plaintiff's action was not considered on the merits.  The current appeal before the District Court is Plaintiff's third appeal.

This case involves more than ten years of records, four separate hearings before the ALJ with decisions, four Appeals Council decisions, and two prior District Court remands – all of which are in the record.  Considering the time that this case has been pending and the number of years involved, the record contains relatively few medical records.

### December 9, 1993 Hearing Before the ALJ

Plaintiff testified at a hearing before the ALJ on December 9, 1993.  [R. at 36]. Plaintiff was born April 17, 1961, and was 32 years old at the time of the hearing before the

ALJ.  [R. at 40].  Plaintiff stated that she had three children, ages 18, 17, and 9.  [R. at 41].

Plaintiff was 5'4" and weighed about 203 pounds.  [R. at 41].   According to Plaintiff, she

had gained weight in the previous six months because she is not able to engage in any

activity.  [R. at 41].

Plaintiff testified that she drove approximately once each week.  [R. at 42].  Plaintiff

completed eleventh grade and later obtained her GED.  [R. at 42].

According to Plaintiff, at the time of her hearing, her last prior work was in 1992

when she worked in a fast food restaurant.  Plaintiff left that job to work for her mother in

a café.  [R. at 43].  From 1986 until 1988 Plaintiff stated that she worked as a nurse's aide.

[R. at 43].   Plaintiff was injured while working as a nurse's aide, received a workers'

compensation settlement, and was unable to return to that type of work.  [R. at 45].

Plaintiff testified that she was unable to work due to back pain from her low back

(radiating to her left leg and hip), numbness in her feet and legs, and muscle spasms in her

calves and her hip.  [R. at 47-49].   Plaintiff stated that she visited Dr. Ziders for her

complaints, and had seen Dr. Ziders since 1988.  [R. at 49].  Plaintiff also testified that she

suffers from thoracic outlet syndrome[3/] which causes her arm to swell, and leads to

radiating pain in her shoulders and fingers.  According to Plaintiff, washing dishes, writing,

or holding a book exacerbates her symptoms.  [R. at 51].  Plaintiff noted that one of her

doctors suggested she walk as much as possible because the only way to alleviate the

---

[3/]     Taber's Cyclopedic Medical Dictionary 1984 (17th ed. 1993), defines "thoracic outlet compression syndrome" as "a symptom complex caused by conditions in which nerves or vessels are compressed in the neck or axilla.  Anatomically, the cause is compression by structures, such as the first rib pressing against the clavicle. Also, the condition may be associated with a cervical rib or scalenus anticus syndrome.  It is characterized by brachial neuritis with or without vascular or vasomotor disturbance in the upper extremities."

problem was to lose weight.  [R. at 51].  Plaintiff's doctor also suggested swimming, but Plaintiff stated that she did not have access to a swimming pool.  [R. at 51].

Plaintiff testified that she suffers from severe headaches a few times each month. [R. at 52].  According to Plaintiff, her eyes become very sensitive and she has to lay down. The headaches last for a few days.  Sometimes Plaintiff receives a prescription shot from her doctor (Dr. Manning) for the headaches.  [R. at 52].  Plaintiff went to the emergency room in November due to severe muscle, hip, and leg pain.  Plaintiff stated she was given a shot for the pain.  [R. at 53].  Plaintiff additionally testified that she suffers from stomach problems due to inflammation and that she is unable to take stomach medicine.  [R. at 53].

At her hearing in 1993, Plaintiff testified that she could sit for only 10 to 15 minutes before she would have to stand or lie down, that she could walk for approximately one-half of a block, and that she could lift approximately 10 pounds.  [R. at 54-55].  Plaintiff noted that if she stands to do dishes, her hip hurts.  [R. at 54].  Plaintiff believes she can stand for approximately ten to fifteen minutes.  [R. at 54].  Plaintiff is sometimes able to walk to the post office, which is a distance of about one-half of one block, but Plaintiff noted that she begins to hurt on her return trip.  [R. at 55].  Plaintiff noted she had some problems sleeping because she suffered from cramps and stiffness after laying down.  [R. at 55]. Plaintiff also stated that she dropped items with her right hand.  [R. at 56].

Plaintiff noted that her daily activities generally consisted of waking at 7:00 a.m., and doing some light housework (dusting or vacuuming).  [R. at 57].  Plaintiff sometimes does laundry and watches television.  [R. at 57].  Plaintiff noted that her doctor told her that surgery would not assist her problems.  [R. at 60].

## June 1, 1995 Hearing Before the ALJ

Plaintiff's attorney noted that the Appeals Council had remanded the action to the ALJ for additional RFC determinations.  [R. at 66].

Plaintiff testified that she was married and had one child, an eleven year old, remaining at the house.  Plaintiff stated that she was 5'4" and 191 pounds.  [R. at 67]. Plaintiff noted that her normal weight had previously been approximately 170 - 175 pounds. [R. at 68].

Plaintiff testified that her last work was in May of 1992.  [R. at 68].  Plaintiff's last work was at a café.  Plaintiff also attempted to do some secretarial work in June 1992 but was unable to do the work.  [R. at 71].

Beginning in 1992, Plaintiff stated that her lower back hurt so much that she could hardly walk or stand.  Plaintiff believes that Dr Manning placed limitations upon what Plaintiff could physically perform, and that Dr. Zeiders indicated that Plaintiff should not lift anything heavy.  [R. at 70].

Plaintiff agreed that her primary problems included arthritis, inflammation, pain in her hip that radiated to her leg, muscle cramps, headaches and eye swelling.  [R. at 71]. Plaintiff believes that her biggest cause of discomfort is her back pain.  Plaintiff stated that the pain and spasms from her back sometimes cause her headaches.  [R. at 73].  Plaintiff noted that she has headaches about two or three times each week, and that they last for two or three hours.   [R. at 73].  Plaintiff also stated that she suffered from thoracic outlet syndrome, and was initially diagnosed by Dr. Zeiders in 1987 or 1988.  [R. at 74]. According to Plaintiff, her hands swell, and sometimes go numb or tingle.  [R. at 75]. Plaintiff drops things from her hand three or four times each week. [R. at 76].  Plaintiff also

-- 5 --

experiences pain in her neck and shoulder and down her arm.  [R. at 76].  Plaintiff experiences pain in her lower back and states it causes difficulty in walking or bending.  [R. at 78].  Walking or attempting to exercise causes her pain.  [R. at 79].  Plaintiff noted that she was unable to perform sit-ups.  [R. at 79].

Plaintiff believes she could remain seated for approximately thirty minutes at a time.  [R. at 82].  Plaintiff could stand for 30 to 45 minutes before she would need to sit.  [R. at 82].  Plaintiff generally lays down for about 30 minutes several times during the day.  [R. at 83].  Plaintiff could walk approximately one block.  [R. at 83].

According to Plaintiff, in an average week she drove approximately two or three miles to the grocery store, once or twice each month.  [R. at 68, 84].  Plaintiff wears a back brace that she was prescribed sometime in 1993.  [R. at 85].

### November 13, 1998 Hearing Before the ALJ

Plaintiff testified that she was 37 years old at the time of the hearing before the ALJ.  [R. at 353].  Plaintiff was 5'4" and 200 pounds.  Plaintiff stated that she sometimes loses about 20 pounds, but then she gains the weight back again.  [R. at 354].  According to Plaintiff, she smokes about one pack each day.  [R. at 360].

Plaintiff testified that she has a driver's license and had no difficulty driving.  [R. at 360].  Plaintiff's longest drive since May 1992 is a 70 mile drive from Pawhuska to Tulsa.  [R. at 360].  Plaintiff has one child, age 15, who lives at home.  [R. at 361].

Plaintiff believes that from May 1992 through December 1993 she spent a lot of time on her couch.  [R. at 362].  Plaintiff stated that she played bingo about twice in the past ten years, and met with teachers only when required.  [R. at 362].  Plaintiff believes that her activities have not changed much since January of 1994.  [R. at 363].

-- 6 --

Plaintiff stated that she is unable to work because whenever she begins to move around she experiences pain in her back and down her legs and feet and into her neck and arms.  [R. at 364].  Plaintiff noted that in 1988 she was injured in a nursing home and she believes that the injury precipitated her problems.  [R. at 364].  According to Plaintiff, it took approximately thirty minutes for her to experience pain which would force Plaintiff to lie down.  [R. at 365].  Plaintiff testified that she used a back brace for approximately one year.  [R. at 365-66].  From May 1992 thru December 1993 Plaintiff stated that her shoulder and arm pain was the primary problem that kept her from being able to work.  [R. at 366].

Plaintiff also noted that during the 1992 to 1993 time frame she experienced bad headaches.  [R. at 366].  The headaches occurred once or twice each month and lasted for two to three days.  [R. at 367].  When a headache occurred, Plaintiff rested.  Plaintiff did not do dishes or other chores while experiencing a headache.  [R. at 367].  Plaintiff noted that her pain and her headaches continued.  [R. at 368].

According to Plaintiff, Dr. Zeiders told her to swim, and the pain got a little better after she began swimming, for a few months.  [R. at 369].  Plaintiff's husband bought her a pool.  [R. at 369].  Plaintiff noted that she was having some emotional trauma because she and her husband had recently divorced.  [R. at 368].

Plaintiff believes that the longest amount of time that she could walk is about 30 minutes, or one and one-half blocks.  [R. at 371].  Plaintiff could stand approximately 20 to 25 minutes.  [R. at 371].  Plaintiff can sit about 30 minutes.  [R. at 371].  Plaintiff generally lays down for 30 minutes several times each day.  [R. at 376].

According to Plaintiff, in 1988 or 1989 she was supposed to have surgery to remove two ribs due to her thoracic outlet syndrome.  [R. at 373].  However, Plaintiff did not have the surgery because she was frightened.  [R. at 373].

Plaintiff testified that she also has problems with her right hand.  If Plaintiff stirs a cake mix, her fingers stiffen, tighten, and swell between her thumb and finger.  [R. at 377].  Plaintiff also experiences pain in her heels.  [R. at 377].

Dr. Harold Goldman testified as a medical expert at the hearing.  [R. at 381].  He sated that he had reviewed the medical information in the case.  From May 1992 thru December 1993, the medical doctor concluded that Plaintiff neither met nor equaled a Listing.  The doctor noted that Plaintiff had a diagnosis of thoracic outlet syndrome in 1988.  [R. at 382].  Plaintiff had pain and restricted motion of her right arm which improved when Plaintiff lost weight.  The doctor noted that there was no Listing for thoracic outlet syndrome, but that, functionally, it was in the category of arthritis of a major joint in the upper extremity.  Listing 1.04 requires functional x-ray changes and gross anatomical deformity or restricted motion.  The doctor testified that Plaintiff would not meet this Listing.  Based on all of Plaintiff's objective findings, the doctor noted that primarily the problem for Plaintiff was a pain syndrome.  [R. at 383]. The medical expert also noted that the record contained no medical documents regarding any visits to psychiatrists or psychologists.  [R. at 383].

According to the medical expert, thoracic outlet syndrome of the upper extremities would interfere with Plaintiff's ability to lift, and her right hand lifting ability would probably be limited to five pounds frequently or occasionally eight pounds, but certainly not ten.  [R. at 384].  Plaintiff would have difficulty with fingering and feeling and would have difficulty

reaching forward and overhead, and would be limited by at least 50% difficulty in the use of her right upper extremity.  Plaintiff should have no limitation with her left upper extremity but there would be some pain with use.  [R. at 384].  This difficulty would not have disappeared over time.  [R. at 385]. The doctor testified that there was nothing in the medical record that made him question Plaintiff's credibility.  [R. at 388].

### October 10, 2002 Hearing Before the ALJ

Plaintiff testified on October 10, 2002, at a hearing before ALJ Jordan.  [R. at 582]. Plaintiff's attorney, at the hearing, stated that Plaintiff had been to the emergency room on the previous day and had been diagnosed with a liver problem for which she would have additional testing, the afternoon of the hearing, at a hospital in Tulsa.  [R. at 585].

Plaintiff was 41 years old at the time of the hearing before the ALJ.  [R. at 586]. Plaintiff testified she was 5'4" and weighed 218 pounds.  [R. at 587].  According to Plaintiff, she normally weighs 180 to 190.  [R. at 587].

Plaintiff last worked in May 1992.  [R. at 590].  Plaintiff stated that she stopped working because her low back gave out and she was unable to walk due to severe pain. [R. at 590].  Plaintiff testified that she has tried to work since May 1992, but has been unable to work.  Plaintiff worked for the census 2000.  [R. at 591].  Plaintiff stated that she worked for two weeks, and then her back gave out on her.  [R. at 591].  Plaintiff also stated that she tried to work at ARC Industries, around 2000, for two days.  [R. at 591].  Plaintiff believes that she worked for a total of less than three weeks.  [R. at 591].

Plaintiff testified that she smokes about one-half of one pack each day.  [R. at 591]. Plaintiff testified that she is able to drive but begins to get spasms in her shoulders and hands after driving 50 miles.  [R. at 592].  According to Plaintiff, the longest drive she has

made since May 1992 was from Okfuskee to Tulsa, which was about a one hour trip.  [R. at 592].

Plaintiff testified that from May 1992 through the end of 1994, Plaintiff lived in a house with three children.  The children are currently 19, 25, and 27, and none of them live at home with Plaintiff.  [R. at 593].  The last one to live at home with Plaintiff left in 2000.  From May 1992 through 1994, Plaintiff sometimes went grocery shopping and to Wal-Mart.  [R. at 594].  Plaintiff went to bingo once every two or three years.  [R. at 594].  Plaintiff went to school functions when she had to – including school plays and choir.  [R. at 594].  Plaintiff stated she spent most of her time at home due to pain in her lower back.  [R. at 595].

According to Plaintiff, she was advised not to have back surgery.  [R. at 596].  Plaintiff stated that from May 1992 thru 1994 she had virtually constant low back problems.  [R. at 596].  According to Plaintiff, she was unable to walk well, and was limited to walking about one-half of one block.  [R. at 596].  After walking, Plaintiff experienced back spasms and was forced to lay down and take medication to alleviate the pain.  [R. at 597].  Plaintiff also testified that she had a back brace which she wore for about one year.  [R. at 597].

Plaintiff testified that in 1988 she was diagnosed with thoracic outlet syndrome.  [R. at 598].  Plaintiff noted that she was able to work for a while she had thoracic outlet syndrome.  [R. at 598].  The problem affected her ability to stir things with her hands.  [R. at 598].  Plaintiff noted that her right hand would cramp.  [R. at 699].  Plaintiff was unable to see a doctor during this time, but stated that the pain medication for her back helped to alleviate the pain caused by thoracic outlet syndrome.  [R. at 600].

-- 10 --

Plaintiff also remembers experiencing some stomach problems, perhaps around this same time frame. [R. at 600]. Plaintiff believes she had gastritis a few times from taking anti-inflammatory pills. [R. at 601]. According to Plaintiff, her problems would last for two or three days, and consist of severe pain in her upper stomach. [R. at 601].

Plaintiff testified that she also experienced headaches that lasted for hours about two or three times each month. [R. at 602]. Plaintiff additionally experienced muscle spasms in her neck which required her to occasionally lay down for an hour or more. [R. at 602].

The ALJ additionally asked Plaintiff about the time frame from January 1995 until present. Plaintiff stated that she lives in a mobile home with her husband. [R. at 604]. Plaintiff's current activity level is about the same as it was in 1992 thru 1994. [R. at 604]. Plaintiff does some meal preparation, and tries, as much as she can, to vacuum and mop. [R. at 604].

According to Plaintiff, she still experiences back problems. Plaintiff stated that since 1995 the problem has gotten better if she does not do anything. [R. at 605]. Plaintiff also has problems with thoracic outlet syndrome. [R. at 605]. Plaintiff testified that her stomach problems have become increasingly severe. [R. at 605]. Plaintiff noted that she has had to go the emergency room numerous times to drink something that the emergency room refers to as a "green lizard." [R. at 605].

Plaintiff does not believe that her headaches are as severe as they previously were. [R. at 606]. With respect to her recent liver problems, Plaintiff noted that she has experienced pain in her right side for several years, and that some tests had indicated gastric erosion and an ulcer in her duodenum. [R. at 606].

Plaintiff also noted that she was diagnosed with asthma in 1999 or 2000.  [R. at 607].  According to Plaintiff, she cannot go outside when it is moldy and cannot be around strong perfumes.  [R. at 607].  Plaintiff stated that her medication (Balsiltec) controls her asthma.  [R. at 609].

Plaintiff believes that she can stand for approximately 20 minutes before she would need to sit down.  [R. at 609].  Plaintiff can sit for approximately 30 to 45 minutes.  [R. at 609].  Plaintiff can lift a four pound bag of sugar or a gallon of milk.  [R. at 609].

Plaintiff believes that she has gotten worse since 1992.  [R. at 610].  Plaintiff noted that her doctors have told her to diet, but that she is unable to exercise and that she does not eat much.  [R. at 610].  According to Plaintiff, she was supposed to have her top two ribs removed due to her thoracic outlet syndrome, but the risks of surgery scared her and she decided not to have them removed.  [R. at 610].

Plaintiff stated that she never had medical insurance, until very recently.  [R. at 612].  According to Plaintiff, due to her medical bills she was forced to declare bankruptcy and refinance her home to make monthly payments on the bills.  [R. at 612].

Plaintiff also believes that she suffers from depression.  [R. at 612].  Plaintiff experiences crying spells, primarily when her stomach is really hurting her.  [R. at 612-13].

Plaintiff has difficulty reaching with her arms, and according to Plaintiff, she is not supposed to reach over her head.  [R. at 613].  Plaintiff can reach in front of herself, but when she is folding clothes, she notices that her shoulders begin to tighten.  [R. at 613].  Plaintiff states that Dr. Hatchet, in 1988, told her not to reach overhead, but that she has not returned to see him.  [R. at 614].

Dr. Harold Goldman testified at the hearing before the ALJ.  [R. at 615].  Dr. Goldman stated that Plaintiff did not meet a Listing.  [R. at 616].  The doctor testified that Plaintiff had been given a weight restriction by "Dr. Zirus" of lifting 10 pounds frequently and 20 pounds occasionally.  Dr. Goldman added that he believed Plaintiff could frequently lift 20 pounds and occasionally lift 35 pounds, sit, stand, or walk for a total of eight hours in an eight hour day, and stand for four hours in an eight hour day.  Plaintiff could walk for four hours in an eight hour day, and sit for six hours in an eight hour day; stand for two hours at a time; walk for two hours at one time; and sit for six hours at a time.  [R. at 618].  Plaintiff could occasionally bend or crawl; frequently stoop or squat or climb.  [R. at 618].  Plaintiff had no difficulty in fingering, feeling, grasping, or reaching.  [R. at 619].  Plaintiff would have some restriction to being around dust or fumes due to her asthma.  [R. at 619].

Dr. Goldman testified that no objective medical findings in the record would correlate to a diagnosis of chronic pain syndrome.  [R. at 619].

**Medical Records**

On March 11, 1996, Plaintiff was treated after tripping and hitting a door.  [R. at 336].  Plaintiff reported shoulder soreness and some difficulty raising her arm.  [R. at 336]. X-rays were negative of Plaintiff's right shoulder.  [R. at 337].

Plaintiff went to the Pawhuska Emergency Room on September 14, 1997, complaining of cramping in her calves precipitated by walking down a hill.  Plaintiff was advised to take hot baths, stop smoking, and stretch and limit her walking for two to three days.  [R. at 324].

Medical records from January 1988 indicated Plaintiff had muscle spasms of her back. On January 20, 1988, Plaintiff was advised that it was okay for her to return to work, but that she should do no heavy lifting.  [R. at 519].

Plaintiff had a test associated with her thoracic outlet syndrome on April 21, 1988. [R. at 147].  The final impression of the examiner was noted as "mildly positive results with respect to possibility of thoracic outlet syndrome of the right arm.  Specifically, these results are consistent with the probability of a postganglionic involvement of the medial cord of the brachial plexus for the right arm."  [R. at 148].

On July 21, 1998, Plaintiff's heel toe gait was normal.  [R. at 327].  On August 4, 1998, Plaintiff's doctor noted she was seen regarding back and heel pain.  The doctor believed that a lot of Plaintiff's pain was related to her lower disc from her back.  Plaintiff's hip structure and joints looked good.  [R. at 326].

X-rays dated September 10, 1992, were interpreted as a normal bone scan with no significant abnormalities revealed.  [R. at 166].  Plaintiff's hips and spine appeared normal. [R. at 166].

An MRI of Plaintiff's lumbar spine was interpreted on August 4, 1993.  [R. at 185]. A considerable disc bulge was noted at the L4-L5 level; mild intervertebral disc herniation was observed at the L5-S1 level; decreased signal was described at the L4-L5 and L5-S1 intervertebral discs.  [R. at 185].

A medications list dated November 9, 1993, indicated Plaintiff was taking Propox for joint pain, Cyclobenzaprine for muscle spasm, and was awaiting a back brace.  [R. at 189]. A medications list dated May 31, 1995, indicated Plaintiff was taking medications for low thyroid, fluid, and weight control.  In addition, Plaintiff was taking codeine for back pain and

Chlorzoxazone for muscle spasm.  [R. at 250].  A medications list dated November 12, 1998, listed Darvocet for stiffness and pain in the back, Tylenol Gel caps for muscle stiffness and backaches, and Pepcid AC for relief of acid indigestion.  [R. at 328].

Plaintiff complained of headaches on December 15, 1999.  [R. at 447].  Plaintiff also complained of a two-week history of cough and congestion.  Plaintiff was diagnosed with unresolved bronchitis.  [R. at 450].

On March 6, 2000, Plaintiff complained of shortness of breath.  [R. at 452].  Plaintiff was given Albuterol and discharged.  [R. at 454].

Plaintiff was admitted to the emergency rom on October 13, 2000, complaining of low back and coccyx pain after falling off of a porch.  Plaintiff also hit her left elbow when she fell.  [R. at 459].  The doctor recommended ice applied to the sore areas, and Flexeril was prescribed.  [R. at 459].

Plaintiff was seen in the emergency room on January 11, 2001, complaining of wheezing and headache.  [R. at 461].  Plaintiff was asked to try to quit smoking.  [R. at 464].

On May 30, 2001, Plaintiff complained of esophagitis.  Plaintiff's EKG was normal.  [R. at 491].  Plaintiff had muscle spasms of her upper back.  A recent gallbladder study was normal.  [R. at 491].  Plaintiff was released to follow-up with Dr. Manning.

On June 30, 2001, Plaintiff was treated in the emergency room for a headache.  [R. at 525].  On examination, Plaintiff was tender in her posterior neck.  [R. at 525].  Plaintiff was prescribed Lortab.  [R. at 525].

Plaintiff was treated at the emergency room on July 6, 2001, for left chest pain.  [R. at 508].  Plaintiff had reportedly decreased her smoking from two packs per day to one

pack per day.  [R. at 508].  Pain was determined to be, most likely, "gas pocket-type pain."

Plaintiff was told to rest and return if the symptoms worsened.  [R. at 508].

On September 10, 2001, Plaintiff went to the emergency room complaining of pain

in her midchest thru to her back.  [R. at 526].  The doctor noted that Plaintiff had previously

been to the emergency room with similar complaints.  Gallbladder sonograms were normal,

a chest x-ray was normal, and an EKG was normal.

On January 31, 2002, Plaintiff reported to the emergency room complaining

of headaches and muscle tension.  [R. at 528].  Plaintiff was given Tylox.  [R. at 529].  On

March 15, 2002, Plaintiff complained that she was having difficulty breathing.  [R. at 532].

Plaintiff was given a treatment with Albuterol and Atrovent.  Plaintiff was asked to stop

smoking.  [R. at 533].  On May 16, 2002, Plaintiff complained of a headache since "earlier

today."  [R. at 541].

On June 13, 2002, Plaintiff complained of chronic GI pain.  An EKG was normal.

Plaintiff was given nitroglycerin and aspirin.  A "Green Lizard" gave Plaintiff relief.  [R. at

545].

### Doctor's Letters and Examinations

On June 5, 1978, Plaintiff's doctor noted that Plaintiff had an "obesity problem."

Plaintiff weighed 155 pounds and was 5'4".  [R. at 523].

Notes from Dr. Manning dated January 9, 1992, note that Plaintiff is concerned

about her weight.  "Appears to be healthy otherwise. . . . "  [R. at 516].

W.T. Manning, M.D., wrote on February 12, 1993, that he had not seen Plaintiff

since November 1992.  At that time, Plaintiff had complained of stomach pain and was

placed on antibiotics.  Plaintiff previously complained of low back pain and was seen in July

1992 by Dr. Thompson.  Plaintiff was described as heavy with a sedentary lifestyle.  Plaintiff complained of discomfort and pain when standing or walking.  [R. at 170].  "I can see where the patient would be partially disabled from those occupations requiring a lot of standing, stooping, or lifting, but, in general, her health is such that other types of employment surely could be found.  However, she lacks the skills and dexterity of office work, so finding suitable employment may be somewhat of a problem."  [R. at 170].

Plaintiff was examined by Jack H. Brown, M.D., on March 17, 1993.  [R. at 177]. Plaintiff, while working as a nurses aide, in 1988, was injured when lifting a patient.  Plaintiff injured her right shoulder, neck, left hip, lower back, and legs and feet.  [R. at 177]. Plaintiff weighed 204 pounds and was 5'4" tall.  [R. at 177].  Plaintiff had a full range-of-motion of her cervical spine as well as forward flexion and extension.  [R. at 178].  Plaintiff's shoulders, elbows, wrists, and finger joints were all within normal limits.  [R. at 178]. Plaintiff ambulated without difficulty.  Heel and toe walking was within normal limits.  [R. at 178].  Fine and gross motor dexterity were within normal limits.  [R. at 178].  Plaintiff had no joint deformity observed by the examiner.  [R. at 178].  Dr. Brown completed a range-of-joint motion form and indicated that Plaintiff's range-of-motion was normal.  [R. at 179].

A letter dated November 8, 1993, by James W. Zeiders, M.D., notes that Plaintiff was seen in February 1988 for evaluation of back and shoulders.  [R. at 183]. Plaintiff was diagnosed with thoracic outlet syndrome and referred to Dr. John Hatchett who believed Plaintiff would improve with conservative treatment.  [R. at 183].  Plaintiff was started on an exercise program and gradually improved.  In August 1993 Plaintiff had increasing lower back pain and degenerative disc disease of her lumbar spine.  MRI studies showed bulging disc and deterioration.  Plaintiff was tried on anti-inflammatories but none gave lasting

relief.  Plaintiff was encouraged to lose weight.  [R. at 183].  "From the restricted use of her neck and upper extremities due to the outlet syndrome and the myofascial inflammation, now associated with the lower back problem it is difficult to conceive that she is employable by any [sic] anybody's standards.  Retraining might be a possibility; however, it is difficult to imagine what areas that would be agreeable with her multiple areas of involvement."  [R. at 183].

Dr. Zeider completed a form for Plaintiff's attorney on November 16, 1998.  [R. at 348].  He noted that Plaintiff should alternate between sitting and standing to relieve her pain symptoms, approximately every 30 to 40 minutes.  [R. at 348].  Plaintiff could frequently lift 10 pounds, occasionally lift 11 to 25 pounds, and infrequently lift over 25 pounds.  [R. at 348].  Plaintiff was also noted as needing to sometimes lay down for pain relief.

An RFC form was completed by Dr. Zeiders on June 21, 1995.  [R. at 253].  He indicated that Plaintiff could sit for two hours at one time, stand for one hour at a time and walk for one hour at a time.  [R. at 251].  Plaintiff could sit for four hours in an eight hour day, stand for two hours in an eight hour day and walk for one hour in an eight hour day.  [R. at 251].  Plaintiff could lift five pounds continuously, 6 - 10 pounds frequently, 11 - 20 pounds occasionally, and no more than 20 pounds.  [R. at 251].  Plaintiff could carry 0 to 10 pounds continuously, 11 - 20 pounds frequently, and 21 - 25 pounds occasionally.  [R. at 252].  Plaintiff was able to repetitively use her hands for grasping and manipulation.  [R. at 252].

Doctor notes from Dr. Manning dated November 6, 1998, indicate that Plaintiff was at her doctor's for an examination for Social Security Disability.  "However, feel that we are

unable to fill out the forms to her satisfaction due to not having not [sic] seen her for post injury.  She was seen & treated by Dr. Daugherty & therefore is referred back to him for evaluation of this disability."  [R. at 515].

Plaintiff had a psychological evaluation on July 5, 2002, conducted by Minor W. Gordon, Ph.D.  [R. at 424].  Plaintiff's chief complaint was that she had degenerative disc disease and thoracic outlet syndrome and was in severe pain.  Plaintiff also complained of high blood pressure, water retention, and ulcers.  [R. at 424].  Plaintiff completed the 11th grade and obtained a GED.  Plaintiff smokes one pack of cigarettes each day.  Plaintiff indicated that her daily activities consisted of watching television and spending time on the internet.  [R. at 424].  Plaintiff was 5'4" and 220 pounds and indicated her normal weight was 190, but that she had gained weight due to inactivity.  [R. at 424].  The doctor noted that Plaintiff appeared to be depressed, and that her sleep was disturbed; her energy was low; and her appetite was fair.  [R. at 425].  The examiner concluded Plaintiff was mildly depressed.  [R. at 425].  Plaintiff's activities were described as close to normal for an employed individual.  Plaintiff's memory was intact, and although Plaintiff had some problems with mild depression, the examiner noted that this, alone should not preclude Plaintiff from gainful employment.  [R. at 425].

Plaintiff completed a development questionnaire which was received in the social security office on August 19, 2002.  [R. at 445].  Plaintiff indicated that she had been treated for low back strain since March 2000, an inflamed esophagus, pyloric ulcer, inflamed stomach, and high blood pressure.  [R. at 446].

On September 6, 2002, Plaintiff saw Thomas M. Auxter, D.O. [R. at 546].  The physician noted Plaintiff denied arthralgia, joint stiffness, back pain, muscle cramps, or

-- 19 --

myalgia.  [R. at 546].  On September 26, 2002, Plaintiff denied any adverse effects from

her medications.  [R. at 562].

A medications list dated August 28, 2002, lists Metroprolol (for high blood pressure),

Hyoscemine Sulfate (to relax esophagus), Lasix (for water retention), and Amvibent (for

asthma).  [R. at 549].

## II. SOCIAL SECURITY LAW AND STANDARD OF REVIEW

The Commissioner has established a five-step process for the evaluation of social

security claims.  *See* 20 C.F.R. § 404.1520.  Disability under the Social Security Act is

defined as the

> inability to engage in any substantial gainful activity by reason
> of any medically determinable physical or mental impairment
> . . . .

42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Social Security Act only if his

> physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work in the
> national economy. . . .

42 U.S.C. § 423(d)(2)(A).[4]

---

[4]   Step One requires the claimant to establish that he is not engaged in substantial gainful activity (as defined at 20 C.F.R. §§ 404.1510 and 404.1572).  Step Two requires that the claimant demonstrate that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 1521.  If claimant is engaged in substantial gainful activity (Step One) or if claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, claimant's impairment is compared with those impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings").  If a claimant's impairment is equal or medically equivalent to an impairment in the Listings, claimant is presumed disabled.  If a Listing is not met, the evaluation proceeds to Step Four, where the claimant must establish that his impairment or the combination of impairments prevents him from performing his past relevant work.  A claimant is not disabled if the claimant can perform his past work.  If a claimant is unable to perform his previous work, the Commissioner has the burden of proof (Step Five) to establish that the claimant, in light of his age, education, and work history, has the residual functional capacity ("RFC") to perform an alternative work activity in the national economy.  If a claimant has the RFC to perform an alternate work activity, disability benefits are denied.  *See* <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

The Commissioner's disability determinations are reviewed to determine (1) if the correct legal principles have been followed, and (2) if the decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

The Court, in determining whether the decision of the Commissioner is supported by substantial evidence, does not examine the issues *de novo*. *Sisco v. United States Dept. of Health and Human Services*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner. *Qualls v. Apfel*, 206 F.3d 1368 (10th Cir. 2000); *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). The Court will, however, meticulously examine the entire record to determine if the Commissioner's determination is rational. *Williams*, 844 F.2d at 750; *Holloway v. Heckler*, 607 F. Supp. 71, 72 (D. Kan. 1985).

"The finding of the Secretary[5/] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is that amount and type of evidence that a reasonable mind will accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Williams*, 844 F.2d at 750. In terms of traditional burdens of proof, substantial evidence is more than a scintilla, but less than a preponderance. *Perales*, 402 U.S. at 401. Evidence is not substantial if it is overwhelmed by other evidence in the record. *Williams*, 844 F.2d at 750.

---

[5/]   Effective March 31, 1995, the functions of the Secretary of Health and Human Services ("Secretary") in social security cases were transferred to the Commissioner of Social Security. P.L. No. 103-296. For the purpose of this Order, references in case law to "the Secretary" are interchangeable with "the Commissioner."

This Court must also determine whether the Commissioner applied the correct legal standards.   *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).   The Commissioner's decision will be reversed when he uses the wrong legal standard or fails to clearly demonstrate reliance on the correct legal standards.   *Glass*, 43 F.3d at 1395.

### III.  REVIEW

### Treating Physician's Opinion

Plaintiff primarily focuses upon the opinion of Dr. Zeiders, who treated Plaintiff, and asserts that the ALJ did not properly consider Dr. Zeiders' opinion.

By letter dated November 8, 1993, Dr. Zeiders noted Plaintiff's thoracic outlet syndrome, and discussed Plaintiff's restricted use of her upper neck and upper extremities, concluding that "it is difficult to conceive that she is employable. . . . retraining might be a possibility. . . ."  [R. at 183].

Dr. Zeiders completed an RFC form for Plaintiff on June 21, 1995.  The doctor indicated Plaintiff could sit for four hours in an eight hour day; stand for two hours in an eight hour day; and walk for one hour in an eight hour day – adding up to seven hours in an eight hour day.  [R. at 348].  Dr. Zeiders noted that Plaintiff could lift five pounds continuously, 6 to 10 pounds frequently, and 11 to 20 pounds occasionally.  [R. at 253].

Dr. Zeiders additionally completed a form prepared by Plaintiff's attorney on November 16, 1998.  He noted that Plaintiff should alternate between sitting and standing every 30 to 40 minutes, and that Plaintiff could lift 11 to 25 pounds occasionally and frequently lift 10 pounds.  [R. at 348].

The ALJ noted Dr. Zeiders' opinion regarding Plaintiff's employability, and concluded that employability is a vocational matter outside of the doctor's expertise.  The issue of

whether or not Plaintiff is employable is outside of the expertise of the Plaintiff's treating physician, and the ALJ may appropriately disregard employment conclusions.

The "treating physician rule" requires that the Commissioner give more weight to a treating source than to that of a non-treating source. *Langley v. Barnhart*, 373 F.3d 1116 (10th Cir. 2004); 20 C.F.R. § 404.1527(d)(2). "In deciding how much weight to give a treating source opinion, an ALJ must first determine whether the opinion qualifies for 'controlling weight.'" *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). The ALJ, in making this determination, first should consider "whether the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. If the answer to this question is 'no,' then the inquiry at this stage is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. [I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." *Langley*, 2004 WL 1465774; *Hamlin v. Barnhart*, 365 F.3d 1208 (10th Cir. 2004) ("The ALJ is required to give controlling weight to the opinion of a treating physician as long as the opinion is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record."); *Watkins v. Barnhart*, 350 F.3d 1297 (10th Cir. 2003) ("The analysis is sequential. An ALJ must first consider whether the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques.").

In *Robinson v. Barnhart*, 366 F.3d 1078 (10th Cir. 2004), the Tenth Circuit Court of Appeals discussed the analysis the ALJ should make in evaluating a treating physician's opinion.

-- 23 --

An ALJ must first consider whether the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques."  SSR 96-2p, 1996 WL 374188, at *2. If the answer to this question is "no," then the inquiry at this stage is complete.  If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record.  In other words, if the opinion is deficient in either of these respects, then it is not entitled to controlling weight.

If the ALJ concludes that the treating physician's opinion is not entitled to controlling weight, the inquiry does not end.  The ALJ must then evaluate whether the treating source medical opinions are entitled to deference and the ALJ must weigh the treating opinion using all of the factors provided in § 404.1527.  *See Langley*, 2004 WL 1465774; *Hamlin*, 365 F.3d at 1215 (ALJ must consider specific factors in determining what weight to give medical opinion).  The factors which the ALJ should evaluate include:

(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 290; 20 C.F.R. § 404.1527(d)(2)-(6).  *See also Watkins*, 350 F.3d at 1300 (resolving "controlling weight" issue is not end of review; ALJ must evaluate treating physician opinion factors).

In this case, Dr. Zeiders, in 1993, indicated Plaintiff had restricted use of her neck and upper extremities.  In 1995, Dr. Zeiders indicated Plaintiff could lift five pounds continuously, 6 - 10 frequently, and 11 - 20 occasionally.  He also listed sit, stand, and walk

-- 24 --

requirements that amounted to a total of seven hours in an eight hour day. In 1998, Dr. Zeiders indicated that Plaintiff should be permitted to alternate between sitting and standing, and could lift 11 to 25 pounds occasionally and 10 pounds frequently.

The ALJ never discusses the factors for evaluation of a treating physician.  The ALJ states that Dr. Zeiders did not give a RFC other than to restrict the use of the neck, upper extremities, and back, and "inconsistently Dr. Zeiders completed a form prepared in 1998 by the claimant's representative showing that the claimant could frequently lift 10 pounds, occasionally lift up to 25 pounds and infrequently lift over 25 pounds."  [R. at 395T].

Although the ALJ states Dr. Zeiders did not provide a RFC, Dr. Zeiders did provide RFC information in 1995, and additional limited RFC information in 1998.  Dr. Zeiders gave sit, stand and walk limitations which were less than the eight hour day limit required for sustained work activity.  And, although the ALJ notes that Dr. Zeiders' opinion was "inconsistent" with regard to lifting capacities, the inconsistency is not apparent from the record or further discussed in the ALJ's opinion.  The two times that Dr. Zeiders discussed lifting capacities, the doctor noted that Plaintiff could lift no more than ten pounds frequently and 11 - 20 occasionally, as compared to 11 to 25 occasionally.

The Court cannot find that the ALJ adequately addressed the opinion of Plaintiff's treating physician, Dr. Zeider.  On remand, the ALJ should evaluate the opinion of the physician, and discuss the appropriate weight given the physician's opinion.

Dated this 13th day of December 2005.

Sam A. Joyner
United States Magistrate Judge